## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHERYL ANNE EVANS, Individually and as Executrix of the Estate of BRANT JAMES EVANS, | : Civil Action No: |
| | : |
| | : |
| | : ***ELECTRONICALLY FILED*** |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES OF AMERICA, | : |
| | : |
| Defendant. | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |

## COMPLAINT

Plaintiff, Cheryl Anne Evans, Individually and as Executrix of the Estate of Brant James Evans, by and through her attorneys of record, Harry S. Cohen & Associates, P.C. by Harry S. Cohen, Esquire and Douglas L. Price, Esquire bring this Complaint in Civil Action against the above-named Defendant and in support thereof allege as follows:

## PARTIES

1.   Plaintiff, Cheryl Anne Evans, is an adult individual and at all times material hereto resided in Freedom Borough, Beaver County, Pennsylvania.

2.   Plaintiff's decedent, Brant James Evans, (hereinafter "Brant Evans" or "Brant"), then 58 years of age, died testate on January 30, 2013.  At all times material hereto, Brant resided with the Plaintiff in Freedom Borough, Beaver County, Pennsylvania.

3.   Plaintiff is the wife of Brant Evans, deceased.

4.      On March 15, 2013, the Register of Wills of Beaver County, Pennsylvania, issued Letters of Administration to the Plaintiff at estate file number 04-13-00275.

5.      The intestate heirs, and therefore the wrongful death act and survival statutory heirs and intestate heirs include:

      a.  Cheryl Anne Evans, wife of the decedent;

      b.  Shaun Evans, son of the decedent; and

      c.  Curtis Evans, son of the decedent.

6.      Plaintiff brings this action as Executrix of the decedent's estate and on behalf of herself and all potential claimants under the Wrongful Death and Survival Acts.

7.      At no time during the course of his lifetime did Brant Evans bring an action for personal injuries in regard to the events described in this Complaint, and no other action for his death has been commenced against this Defendant.

8.      Defendant United States of America (hereinafter "United States") is the party that maintains the U.S. Department of Veterans Affairs and its divisions and subdivisions.

9.      The US Department of Veterans Affairs was established by Congress to administer the healthcare system for the Veterans of the United States of America, which includes health administration in the VA Healthcare System.

10.     The mission statement for the US Department of Veterans Affairs is: "To fulfill President Lincoln's promise 'To care for him who shall have borne the battle, and for his widow, and his orphan' by serving and honoring the men and women who are America's veterans."

11.     The VA Healthcare System, through its facilities, provides a broad spectrum of medical, surgical and rehabilitative care for eligible veterans who served in the armed forces of the United States of America.

12.     The VA Pittsburgh Healthcare System is a division of the US Department of Veterans Affairs, which provides healthcare to eligible Veterans at its facilities, including the University Drive Campus in Pittsburgh, Pennsylvania and the H.J. Hienz Campus in O'Hara Township, Pennsylvania.

13.     The VA University Drive Campus in Pittsburgh, Pennsylvania (hereinafter "VA University Drive") serves as an acute care facility and has 146 operating beds distributed among medicine, surgery, neurology and critical care.   In addition, it serves a range of outpatient services and has doctor's offices where Veterans are seen on a daily basis for care for a variety of needs.

## NOTICE

14.     On June 11, 2013, the Plaintiff served the Department of Veterans' Affairs Office of General Counsel with two (2) executed Standard Form 95 forms providing notice to the United States Government of these claims; one on behalf of Brant James Evans, deceased, and one on behalf of Cheryl Anne Evans.

15.     On June 18, 2013, the Office of General Counsel for the Department of Veterans' Affairs signed for the two certified mail (return receipt) accepting service of the claims.

16.     On June 20, 2013, the Office of Regional Counsel of the Department of Veterans' Affairs (Region 4) sent a letter to Plaintiff's Counsel requesting additional information.

17.     In a letter dated July 11, 2013, Plaintiffs' Counsel provided additional documentation to Regional Counsel concerning the claims.

18.     On December 23, 2013, the Office of Regional Counsel of the Department of Veterans' Affairs (Region 4) concluded its investigation and denied the claim.

## JURISDICTION

19.     This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671.

20.     On June 11, 2013, the Plaintiff submitted two (2) administrative claim Standard Form 95 to the United States Department of Veterans' Affairs.  Receipt of the claims was made. After six months passed since the filing of the claims, and the United States Department of Veterans' Affairs has denied the claims, all conditions precedent to the Federal Tort Claims Act have been properly met.

21.     Venue is properly within this district under 28 U.S.C. §1402(b) as the acts complained of occurred in the Western District of Pennsylvania.

22.     This case is brought against the United States of America pursuant to 28 U.S.C. §2671, *et seq.* (Federal Tort Claims Act) and   28 U.S.C. §1346(b)(1) for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of the employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the state of Pennsylvania.


## FACTS

23.     Brant Evans was born in 1954 and grew up in the Freedom Borough area of Beaver County, Pennsylvania.

24.     In 1972, Brant voluntarily enlisted in the Marines.

25.     Brant served in several different theaters during the early 1970's, and was honorably discharged, and returned to Beaver County, where he began working for J&L Steel in Beaver County. After several years, J&L Steel closed, and Brant began working in steel mills in Ohio.

4

26.    Brant was married, and had two sons, Shaun and Curtis. Later he divorced, and in 2004, married Cheryl Anne Evans.

27.    In 2004, Brant was diagnosed with lung cancer, for which he underwent surgery and treatment. For the next six years, he received routine treatment, but in 2010, a routine CT showed a spot on his lungs.

28.    Brant was diagnosed with small cell lung cancer and went though regiments of chemotherapy and radiation through the summer of 2011.

## LEGIONELLA

29.    In 1976, the American Legion was holding its convention in Philadelphia, Pennsylvania when an outbreak of infection caused by bacterial of the genus Legionella was recognized.  The outbreak sickened more than 200 people and 34 died.

30.    The epidemiological and microbiological investigation led to the isolation of the Legionella bacteria.

31.    Legionella is known to be present in a variety of circumstances; however it has a predilection for aquatic environments.  Its characteristics allow it to thrive in the lines of water pipes, especially in large buildings, and particularly at temperatures in the range of 35-46° C (95-115° F).

32.    In humans, Legionella usually manifests itself as either a fever, or a serious and potentially fatal infection of the lungs, as seen in pneumonia.  In most, but not all cases, the Legionella infection, also known as Legionnaires' disease, is a result of a person aspirating or inhaling the infected water containing the Legionella bacteria.

33.    Legionnaires' disease is both preventable and treatable.

34.    There is no safe level of Legionella bacteria in a water supply.

5

35.     Since the recognition that the Legionella bacteria can flourish in water systems, certain environments have been noted to be particularly susceptible for the growth of Legionella bacteria, especially hospitals, and as such, healthcare authorities and the Center for Disease Control and Prevention (CDC) monitor and report any known outbreak to contain the spread of any epidemic.

36.     It is a known fact that within Pennsylvania, the rates of a Legionella infection are highest in the southwest corner of the state, and are particularly high in and around Allegheny County which includes Pittsburgh, which is also the site of a large Veterans population and the VA University Drive Campus.

37.     In 1981, the Pittsburgh VA Healthcare System established a Special Pathogens and Clinical Microbiology Laboratory in Pittsburgh to support the clinical work of the VA in determining the presence of Legionella bacteria in human isolates, from VA patients and from water samples taken from VA facilities.

38.     Dr. Victor L. Yu was hired by the VA and was assigned as the Chief of Infectious Disease and the head of the Special Pathogens and Clinical Microbiology Lab.  In 1996, he was assigned to head the lab as a Special Clinical Resource in order to expand testing and research of hospitals and public health agencies throughout the county, including non-VA entities, for the purposes of studying Legionella bacteria.

39.     Ultimately, the Special Pathogens Lab collected approximately 4,000 isolates which were studied and stored in the lab.

40.     Dr. Yu and his colleague Dr. Janet E. Stout, studied the Legionella bacteria and published various articles on the use of rapid diagnostic techniques to determine the presence of Legionella in a water system, as well as studied a copper-silver ionization water system to help eradicate Legionella from the water distribution systems in hospitals.

6

41.     In January, 1997, the Allegheny County (Pennsylvania) Health Department, in response to the Legionella outbreaks in Hospital settings and based on the research that was being conducted by the Special Pathogens Lab, published a directive for identifying, treating and controlling Legionella in Allegheny County Health Care Facilities, of which the Pittsburgh VA Hospital was included.

42.     The directive established testing guidelines for culture protocol for environmental sampling for the presence of Legionella. Specifically, if the percent of positive cultures was equal to or greater than 30% of the total number sampled, then disinfection of the water distribution system is appropriate.

43.     The directive added that the Task Force which studied the issue recognized the arbitrariness of the 30% figure, but noted that even if the percentage of positive cultures was less than 30%, that the definition of the problem be located.

44.     The directive also noted that even if less than 30% testing was positive, prospective surveillance must be conducted, and testing for patients with nosocomial pneumonia be tested for Legionella, as well as ensuring that infection control practitioners work with the patient's physician to ensure testing and monitoring continue.

45.     Early in the decade of the 2000's it appeared promising that the copper-silver ionization units would work well to eradicate Legionella, or at least would prohibit the proliferation of Legionella in a water system, if the water system was properly and knowledgably maintained.

46.     However, in 2006, the Pittsburgh Veterans Affairs Department decided to close the Special Pathogens and Clinical Microbiology Laboratory, and destroyed many of the Legionella samples that were left in the laboratory after Dr. Yu and Dr. Stout had left.

47.     The management at the Pittsburgh Veterans Affairs Department decided that it would rely upon its own maintenance personnel to maintain, test and address the copper-silver ionization and water treatment system at the VA University Drive Campus, as well as control the risk of Legionella disease in the water system.

48.     By August of 2006, officials at the Pittsburgh VA decided that, while they had advanced the knowledge of Legionella, a change in direction was warranted and that the field of infection control should be more directed to the eradication of MRSA (Methicillin-Resistant Staphylococcus Aureus).

49.     Unfortunately, due to the change in focus and the VA Department's lack of understanding of the water systems and the importance of maintaining the same, the copper-silver ion levels in the water treatment system at the VA University Drive Hospital were not properly controlled and were rarely in the effective range to control Legionella. More importantly, the treatment levels were frequently much higher or lower than the effective range, allowing Legionella to grow and fester in the VA University Drive water systems.

## LEGIONELLA AT THE PITTSBURGH VA

50.     While understanding that Legionella was still a concern for the hospital, the Pittsburgh VA continued to monitor its systems for Legionella bacteria.

51.     On September 21, 2007, the VA Pittsburgh Healthcare System tested samples, and specifically, in the 3A Intensive Care Unit, found that 17 out of 19 samples were positive for Legionella.

52.     This finding was followed-up nine months later in June of 2008 when 3 positive tests out of 8 samples in the same intensive care unit tested positive for Legionella.

53.     On June 30, 2010, 4 out of 9 samples in the 3A Intensive Care Unit tested positive for Legionella.

54.     In the following months of July 2010, 6 out of 16 samples tested positive for Legionella.

55.     Upon information and belief, on September 8, 2011, 13 out of 22 samples in Unit 6W, 5E, 5W, 4W, 4E and 3A tested positive for Legionella.

56.     On October 20, 2011, 1 out of 3 samples from the 8W Unit tested positive.

## VA LEGIONELLA POLICIES

57.     In 2008, the Department of Veterans Affairs published a directive establishing guidelines for the evaluation of Legionella risk at the Veterans Hospitals, which was similar to the Allegheny County directive of January 1997.

58.     As part of its policy, the Veterans Health Administration Directive noted that Veterans Hospitals were to test water sites at least annually, and that remedial action for Legionella positive environmental samples occurs if "the percentage of positive distal sites is above a 'threshold level' determined by the facility".

59.     The Veterans Health Administration then went on to say that it is recommended that a threshold level of positive distal sites be set at 30%.

60.     The directive continued on that if there is any association of Legionella bacteria above the threshold that an action plan must be introduced to, among other things, routinely test all patients at the facility with pneumonia for Legionnaire's Disease.

61.     Further, the policy noted that if environmental samples are positive for Legionella pneumophila serogroup 1, then all patients at the facility with pneumonia are to be tested by urinary antigen test.

9

62.     Also, the directive noted that any laboratory confirmed positive results for Legionella disease needs to be assessed for epidemiological linkage to the facility.

63.     In addition, in 2009, the Department of Veterans Affairs Veterans Health Administration issued a directive on domestic hot water temperature limits for Legionella prevention and scald control.  The directive was issued to provide a policy for establishing domestic hot water temperature to prevent Legionnaire's Disease.

64.     Although Legionella had been detected in the water supply at the VA University Drive Hospital, directives on using hot water to eradicate Legionella from the water supply at the VA were not properly implemented in that Legionella continued to fester in the water system.

65.     In the summer of 2011, it became a known fact to officials at the Pittsburgh VA that Legionella was present in the VA University Drive Hospital water system, and several patients began to get sick from the Legionella bacteria.


## WATER SYSTEM MONITORING AT THE VA

66.     Rather than reporting the presence of Legionella to the appropriate health officials, the officials at the VA Pittsburgh and VA University Drive Hospital attempted to control the outbreak on their own.

67.     By December of 2011, a company called Liquitech Environmental Systems (hereinafter "Liquitech") paid a courtesy visit to the VA University Drive Hospital to review the water systems and the copper silver ionization systems.

68.     Liquitech conducted an examination of the VA University Drive's water supply and found that the water system was not being properly maintained.

69.     The employees of Liquitech were told that the maintenance supervisor who was in charge of maintaining the water systems was out on disability leave. The maintenance officials

and employees at the VA University Drive Hospital who were maintaining the water systems did not have the training and experience to handle the complex water treatment systems in place at the VA University Drive Hospital.

70.     While Liquitech was making its courtesy visit, although the VA employees knew that there was Legionella in the water system, they did not disclose that to the employees of Liquitech.

71.     Further, the maintenance workers did not know how to properly eradicate Legionella from the water systems at the VA University Drive Hospital, and altered the test results to make it appear that the conditions were not as bad as they truly were.

## LEGIONELLA OUTBREAK

72.     On September 13, 2011, the Chief of Staff of the VA University Drive Hospital, Ali F. Sonel, M.D., sent a memorandum to the medical staff notifying them that cooper silver ionization units in use at the VA University Drive hot water supply were insufficient to prohibit growth of the *Legionella pneumophila* bacteria.

73.     Dr. Sonel, as a precautionary measure, recommended the use of bottled water in areas where patients would be at a high risk of infection.

74.     Because remediation procedures were going to be implemented, Dr. Sonel asked that a Legionella urinary antigen for all patients with hospital-acquired pneumonia and a Legionella culture for those that were producing sputum be obtained.

75.     In spite of Dr. Sonel's memo, in the three (3) months following the memo, only seven (7) of the seventeen (17) patients in the hospital with suspected hospital-acquired pneumonia were tested for Legionnaire's Disease, allowing ten (10) cases to be underreported, including that of Brant James Evans.

11

## BRANT JAMES EVANS

76.     Brant Evans was 57 and being treated for lung cancer and in August 2011 was treated for cough and infection at the VA.

77.     At the same time, he was returning to the VA for continued treatment for his cancer with medication.

78.     On September 26, 2011, he presented with a cough, fevers and full body aches, among other things.

79.     He continued to spike fevers and was transferred to ICU where a urine antigen test for Legionnaires was done, which was positive for Legionella bacteria.

80.     Brant was treated with antibiotics, and he saw Dr. Robert Muder who told him that the pneumonia he had was Legionnaires' disease, and that there were other cases linked to the VA Hospital at the same time that he was in the hospital, and that he may have acquired the bacteria at the VA.

81.     Brant Evans continued to receive antibiotic therapy and the pneumonia was treated, however, due to the severity of the pneumonia and strain of bacteria, as well as the fact that Brant had lung cancer, for the remainder of his life, he was always noted to have had Legionnaires and that it had caused him additional problems with treatment and recovery above the normal regiment that he was receiving.

82.     Unfortunately, after a long battle with lung cancer, on January 30, 2013, Brant Evans died, having lived with the complications of Legionnaires and lung cancer.

**COUNT I**

*Cheryl Anne Evans, Individually and as Executrix of the Estate of Brant James Evans vs.*
*The United States of America*

**SURVIVAL ACTION**

83.    The foregoing paragraphs are incorporated herein by reference as though the same are set forth herein at length.

84.    Plaintiff brings this Survival Action pursuant to 20 Pa. C.S.A. §3373 and 42 Pa. C.S.A. §8302.

85.    Defendant United States of America was negligent in the following particulars:

    a.    In failing to maintain its water system at the VA University Drive Hospital to allow the Legionella bacteria to grow to epidemic proportions;

    b.    In failing to properly teach, instruct and monitor the employees of the VA University Drive Hospital in how to maintain the water system;

    c.    In failing to have adequate management of the special water treatment system intended to keep the deadly Legionella bacteria from thriving;

    d.    In failing to correct the problems and to understand the phrase "heat and flush" to eradicate the Legionella bacteria from the water system at the VA University Drive Hospital;

    e.    In failing to hyper-chlorinate the water system during potential eradication of the Legionella bacteria from the water system at the VA University Drive Hospital;

    f.    In failing to hire the appropriate facilities manager with the proper education and understanding of water facilities and water treatment system wherein the Legionella bacteria can thrive;

    g.    In failing to test for Legionnaire's Disease in all patients believed to have contracted pneumonia while hospitalized as required by the 2008 guidelines issued by the Veterans Health Administration;

    h.    In failing to communicate between facilities management and infection control to understand the Legionella outbreak and eradication efforts;

i.    In failing to monitor and test those patients in the hospital in September and October of 2011 to determine whether or not they were either susceptible or had the Legionnaire's Disease before it became a health risk or deadly;

j.    In failing to protect the patients in the VA Hospital when they were aware that Legionella was present in the water system;

k.    In reporting inaccurate ionized levels for Legionella control to persist, allowing Legionella to flourish in the water system;

l.    In failing to maintain the copper-silver ionization at the VA;

m.    In altering the test results from the monitoring of the copper-silver ionization system;

n.    In failing to have anyone from the facilities management team actively aware or belonging to the infection control team;

o.    In failing to test patients for Legionnaire's Disease when an active outbreak was known in the hospital system;

p.    In failing to test all outlets, and only selecting and testing certain outlets, to determine whether or not Legionella was present in the hospital;

q.    In failing to control the ion levels in the copper-silver ionization system which allowed Legionella to persist in the water system;

r.    In failing to bring in outside consultants and experts who had knowledge of Legionnaire's Disease;

s.    In failing to recognize the signs and symptoms of Legionnaire's Disease in Brant Evans;

t.    In failing to properly communicate within the hospital concerning the Legionnaire's outbreak so that prophylactic testing and treatment could be performed on patients;

u.    In failing to recognize and act appropriately on the signs and symptoms that Brant Evans showed before a Legionnaire's diagnosis;

v.    In allowing Brant Evans to be exposed to Legionnaire's Disease in the VA Hospital;

w.    In allowing Brant Evans to be exposed to Legionnaire's Disease in the VA Hospital when it was known that there was Legionairres in the VA hospital;

14

x.     In failing to timely test Brant Evans for a Legionella infection while knowing that an active outbreak of Legionella bacteria was occurring in its facility ;

y.     In failing to timely order a urine Legionella antigen test;

z.     In failing to timely order a sputum Legionella culture;

aa.    In failing to timely diagnose Brant Evans with the Legionella bacteria;

bb.    In failing to timely administer intravenous Levaquin prophylactically before definitive Legionella test results were available;

cc.    In failing to inform Brant Evans that Legionella bacteria had been discovered in the water purification system at the facility;

dd.    In failing to protect Brant Evans from Legionella bacteria exposure;

ee.    In failing to promptly consult an Infectious Disease specialist; and

ff.    In failing to promptly order and administer intravenous Azithromycin for Brant Evans.

86.    The negligence of the Defendant, as described herein, was the legal cause of the Plaintiff's injuries and damages as described herein.

87.    The negligence of the Defendant, as described herein, increased the risk that the Plaintiff would suffer the injuries and damages as described herein.

88.    As a direct and proximate result of the negligence of the Defendant, as described herein, the Plaintiff suffered and the Defendant is liable to the Plaintiff for the within described injuries and damages.

89.    As a direct and proximate result of the negligence and/or carelessness of the Defendant, as described herein, Brant Evans suffered the following injuries and damages:

a.   Legionnaire's Disease;

b.   Need for extensive testing and medical procedures;

c.   Need for hospitalizations;

15

    d.   Complications, infections, trauma;

    e.   Physical pain and suffering;

    f.   Loss of enjoyment of life's pleasures;

    g.   Decreased life expectancy;

    h.   Mental anguish and emotional distress; and

    i.   Embarrassment and humiliation.

WHEREFORE, Plaintiff respectfully respects this Honorable Court to enter judgment in her favor and against the Defendant in an appropriate amount and that the Plaintiff be awarded damages and fees, costs, and other such relief as this Honorable Court deems just and appropriate.

### COUNT II

*Cheryl Anne Evans, Individually and as Executrix of the Estate of Brant James Evans vs. The United States of America*

### WRONGFUL DEATH

90.    The foregoing paragraphs are incorporated herein by reference as though the same are set forth herein at length.

91.    Plaintiff brings this Wrongful Death Action pursuant to the Pennsylvania Wrongful Death Act 42 Pa.CSA §8301 and Pa.R.C.P. §2202(a).

92.    The negligence of the Defendant, as described herein, was the "legal cause" of the Plaintiff's injuries and damages as described herein.

93.    The negligence of the Defendant, as described at length herein, increased the risk that the Plaintiff would suffer the injuries and damages as described herein.

94.     As a direct and proximate result of the Defendant's negligence, as described herein, Plaintiff suffered and Defendant is liable for the within and described damages and also the following:

      a.  Funeral expenses for the Decedent;

      b.  Expenses for administration related to Decedent's injuries;

      c.  Medical and hospital expenses; and

      d.  Such other damages as are permissible in a wrongful death action.

WHEREFORE, Plaintiff respectfully respects this Honorable Court to enter judgment in her favor and against the Defendant in an appropriate amount and that the Plaintiff be awarded damages and fees, costs, and other such relief as this Honorable Court deems just and appropriate.

Respectfully submitted,

DATE:  April 14, 2014                    HARRY S. COHEN & ASSOCIATES, P.C.


By:  _/s/ Douglas L. Price, Esquire_
      Harry S. Cohen, Esquire
      Pennsylvania Bar No. 30682
      Douglas L. Price, Esquire
      Pennsylvania Bar No. 64056
      Attorneys for Plaintiff
      Harry S. Cohen & Associates, P.C.
      Two Chatham Center, Suite 985
      Pittsburgh, PA  15219
      (412) 281-3000
      Email: dprice@medmal1.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHERYL ANNE EVANS, Individually :     Civil Action No:
and as Executrix of the Estate of : 
BRANT JAMES EVANS, :

             Plaintiff, :     ***ELECTRONICALLY FILED***

          v. :

UNITED STATES OF AMERICA, :

          Defendant. :

_____ :

## VERIFICATION

I verify that the averments contained in the foregoing **COMPLAINT IN CIVIL ACTION** are true and correct to the best of my knowledge, information and belief. I understand that said averments are made subject to the penalties of 18 Pa. C. S. § 4904 relating to unsworn falsification to authorities.

4/13/2014
Date

By: _Cheryl Anne Evans_
     CHERYL ANNE EVANS, Individually
     and as Executrix of the Estate of
     BRANT JAMES EVANS,